DECISION. *Page 2 
{¶ 1} Plaintiff-appellant Ralph David Eagle, Jr., ("Eagle") appeals from the trial court's entry granting summary judgment for defendants-appellees Luther Owens, Floyd Merida, Ralph Edward Eagle, and Harvest Baptist Church. We affirm.
 {¶ 2} Eagle was involved in a tree-trimming task on the church's property with his father, Ralph, and the other two individual defendants, Merida and Owens, when he was injured. The task consisted of removing an approximately 30-foot-long and 10-inch-diameter limb from the trunk of the tree. The limb was located about 25 feet from the ground.
 {¶ 3} At the Sunday service the day before the accident, the pastor of the church had asked for volunteers to perform the tree-trimming task. The church typically relied on volunteers for landscaping work, including potentially dangerous work such as trimming trees. Merida and Owens volunteered for the task; both had performed similar tasks for the church on several occasions in the past without incident. Prior to leaving the church premises that day, they stood by the tree to examine what had to be done. When Eagle's father walked by, they recruited him to help them. Eagle's father was a deacon of the church — an unpaid, rotating position that required him to make decisions for the church's benefit with the four other deacons. Ultimately, the three men, all over the age of 70, agreed to meet the next morning to perform the task.
 {¶ 4} Eagle, who was almost 50 years old, did not hear the pastor's request for volunteers, and he was not present when his father, Merida, and Owens discussed the task. But he lived with his parents, and when his father left home to meet Merida and Owens the next morning, Eagle insisted on accompanying him. He thought that his father *Page 3 
was going to dig a ditch for the church, and he wanted to help. His father told him to stay home.
 {¶ 5} When Eagle and his father arrived on the church property, Merida and Owens had already angled the church's 40-foot extension ladder against the tree that needed to be trimmed. Merida also had a rope belonging to the church around one limb.
 {¶ 6} Eagle observed Merida ascend the ladder with his own electric chain saw. Eagle thought Merida was too large and too old to be on the ladder. When Merida descended the ladder to retrieve the electric cord that had detached from the saw, Eagle took the saw from him and said that he would do the trimming.
 {¶ 7} His father warned Eagle against ascending the ladder and ordered him to stay on the ground. Eagle rejected that warning and order, and he climbed to the top of the ladder while Owens held it in place.
 {¶ 8} Before Eagle began sawing, his father insisted on changing the position of the rope around the limb. Merida remembered telling Eagle's father that he did not like the change, but he claimed that he deferred to him because he was a deacon.
 {¶ 9} Merida and Eagle's father stood on the ground beyond the end of the limb. According to their plan, they were to direct the limb to the ground with the rope as Eagle sawed. After Eagle had almost cut through the limb, the limb dangled and the end of it rested on the ground, but the limb did not break completely from the trunk. Merida and Eagle's father could not use the rope to pull the limb off and away from the tree. The reason for this is not clear in the record: either the rope was stuck underneath the limb, or the limb broke where the rope had been tied around it. Regardless, the rope was not accessible, and Merida and Eagle's father resorted to pulling and twisting on the dangling limb. Eagle accepted their actions and claimed that he would not have participated in the tree-trimming task if his father and Merida had not been pulling on the limb. *Page 4 
 {¶ 10} Eventually the limb broke from the trunk, and the branches on the limb unexpectedly sprung up and pushed against the ladder and Eagle. To avoid being struck by the falling limb, Owens let go of the ladder and ran. Eagle fell about 25 feet to the ground and injured his heels.
 {¶ 11} Larry Bogle, a church employee, called an ambulance to take Eagle to the hospital. Bogle had seen Merida and Owens preparing for the tree-trimming task prior to the arrival of the Eagles. Bogle greeted the men and continued on to his office without providing any directions for the task. He claimed that the church had always used volunteers for tree trimming and that he was unaware of any injuries that had occurred in carrying out the task.
 {¶ 12} Eagle filed a bare-bones complaint against the defendants, alleging that they had "carelessly and negligently caused a tree limb to fall and strike" him. He also alleged that his father, Owens, and Merida were acting as agents or employees of the church when the accident occurred, and that the church was responsible for the acts of its agents under the doctrine of respondeat superior.
 {¶ 13} The individual defendants moved for summary judgment on the basis that Eagle had assumed the risk of any injury by participating in such an inherently dangerous activity. Alternatively, they argued that they had not acted negligently or that Ohio's volunteer immunity statute shielded them from any liability.
 {¶ 14} The church moved for summary judgment on the respondeat superior claim, arguing that it could not be liable where the individual defendants were not negligent and were not agents of the church, and where Eagle had assumed the risk of his injuries by participating in an inherently dangerous activity. In his response, Eagle alleged for the first time that the church was negligent by accepting three volunteers, all of whom *Page 5 
were over the age of 70 and were taking prescription medication, to perform the "dangerous" task.
 {¶ 15} The trial court granted summary judgment for the defendants without giving any reasons or issuing a decision. Thus, we do not know the basis for the trial court's ruling.
 {¶ 16} We review the grant of summary judgment de novo, applying the standards set forth in Civ.R. 56(C).[1] Therefore, the movant may prevail only if (1) there is no genuine issue of material fact; (2) it is entitled to judgment as a matter of law; and (3) viewing the evidence in the light most favorable to the non-movant, reasonable minds can reach only one conclusion that is adverse to the non-movant.[2]
 Primary Assumption of the Risk {¶ 17} All the defendants claim that because tree trimming is an obviously dangerous activity and because Eagle was warned not to ascend the ladder, Eagle's claims were barred under the doctrine of primary assumption of the risk. "Primary assumption of the risk is a defense of extraordinary strength[,] * * * [and] differs conceptually from the affirmative defenses that are typically interposed in a negligence case * * * because a defendant who asserts this defense asserts that no duty whatsoever is owed to the plaintiff."[3] The defense is a complete bar to recovery in a negligence action.[4] Courts generally apply this doctrine to bar claims for injuries resulting from recreational or sporting activities, because the providers of these activities cannot eliminate their inherent risks.[5] *Page 6 
 {¶ 18} Courts must apply the doctrine of primary assumption of the risk cautiously,[6] and it is generally not applied outside recreational or sporting activities.[7] In this case, we decline to conclude as a matter of law that the defendants did not owe Eagle any duty of care, where Eagle, his father, Merida, and Owens had a plan to complete the task.[8] We hold that the better approach under these circumstances would have been the application of the doctrine of secondary assumption of the risk to allocate liability in the event of any actionable negligence by the defendants.[9] Secondary assumption of the risk, sometimes referred to as contributory negligence, focuses on whether the plaintiff has consented to or acquiesced in an appreciated or known risk.[10] The analysis and conclusions that follow obviate consideration of a remand to the trial court on the issue of contributory negligence.
 Negligence {¶ 19} Next we review whether summary judgment was proper for the individual defendants on the basis that they did not breach their duty to Eagle and thus were not negligent. To prevail on a negligence claim, a plaintiff must demonstrate that (1) the defendant had a duty to protect the plaintiff from injury, (2) the defendant breached that duty, and (3) the breach proximately caused the plaintiffs injury.[11] If, in response to a properly supported motion for summary judgment, the plaintiff fails to meet its evidentiary burden of setting forth facts from which reasonable minds can find for the plaintiff on every element, then the defendant is entitled to summary judgment as a matter of law. *Page 7 
 {¶ 20} "Legal liability for negligence is based upon conduct involving an unreasonable risk to another, which must be established by affirmative evidence tending to show that such conduct falls below the standard represented by the conduct of reasonable men under the same or similar circumstances."[12]
 {¶ 21} Eagle argues that the three men must have breached a duty of care to him because he was injured. But this argument is circular and fails to recognize that Eagle's father, Merida, and Owens were not insurers of Eagle's safety.
 {¶ 22} It is undisputed that all the individual defendants were nonprofessional volunteers. At most, the individual defendants owed Eagle a duty of reasonable care under the circumstances.[13] Eagle did not present any testimony, expert or otherwise, to demonstrate how his father's, Merida's, or Owens' conduct fell below a standard of reasonable care.
 {¶ 23} Eagle's father and Merida followed the plan that Eagle had accepted, but still were not able to pull the limb down without incident. No one foresaw that the branches on the limb would strike Eagle after breaking off from the trunk. No one expected Owens to hold the ladder if it swayed while Eagle was on it, because it was obvious that he was physically unable to do so. And if he had stayed to steady the ladder, he likely would have been struck and injured by a large limb. The duty of reasonable care did not require such a foolish act of bravery, despite Eagle's assertion that he would have steadied the ladder and suffered the blow of the limb if the roles had been reversed.
 {¶ 24} Eagle claims that summary judgment was not appropriate because there were some factual disputes in the record. But only disputes ofmaterial fact preclude summary judgment. Where it was undisputed that the individual defendants were *Page 8 
following the group plan to the extent that any reasonable man would have under the same circumstances, any other disputed facts were immaterial.
 {¶ 25} Thus, after construing all the evidence in the light most favorable to Eagle, no reasonable finder of fact could have concluded that the individual defendants had breached a duty of care owed to him. Because there was no actionable negligence by these defendants, they were entitled to judgment as a matter of law on Eagle's negligence claim.
 Volunteer Immunity Statute {¶ 26} The individual defendants also alleged that they were immune from any liability for their acts under the provisions of Ohio's volunteer immunity statute.[14] Because we hold that the individual defendants were not negligent, an immunity analysis is not warranted.
 Respondeat Superior {¶ 27} Next we review the propriety of the summary judgment granted for the church. Eagle alleged that the church was liable for the acts of his father, Merida, and Owens under the doctrine of respondeat superior. To establish a claim under the doctrine of respondeat superior, the record must demonstrate that a principal-agent relationship existed, and that the tortious conduct was committed by the agent while in the scope of his agency.[15] "The relationship of principal and agent or master and servant exists only when one party exercises the right of control over the actions of another, and those actions are directed toward the attainment of an objective which the former seeks."[16] A principal's liability under this doctrine is based upon the liability of its agent.
 {¶ 28} It is undisputed that none of the individual defendants were employees of the church. But Eagle's father was one of five deacons who sat on a board that governed *Page 9 
the church. And Merida and Owens, who were members, responded to the pastor's direct solicitation of volunteers and used some church property in completing the task.
 {¶ 29} We do not need to determine whether reasonable minds could have concluded that any of the three men were agents of the church and whether Eagle was injured by acts taken within the scope of that agency, because we have held that the individual defendants did not act tortiously towards Eagle in carrying out the task. Where there is no actionable conduct by an agent, there can be no vicarious liability for the principal.
 Premises Liability {¶ 30} Eagle argues also that summary judgment was erroneously granted to the church because reasonable minds could disagree about whether the church was negligent by relying on volunteers, especially medicated elderly volunteers, to perform such dangerous work.
 {¶ 31} We view this negligence claim as a premises-liability claim. In Ohio, the scope of the legal duty owed by a property owner to a person who enters his property is defined by the status of the entrant as an invitee, a licensee, or a trespasser.[17] An invitee is a business visitor who comes on the property of another by invitation, express or implied, to provide an economic benefit to the owner.[18] A landowner owes a duty to an invitee "to exercise ordinary care and to protect the invitee by maintaining the premises in a safe condition."[19]
 {¶ 32} A licensee is "a person who enters the premises of another by permission or acquiescence, for his own pleasure or benefit, and not by invitation."[20] "A licensee takes *Page 10 
his license subject to its attendant perils and risks."[21] The licensor owes the licensee no duty except to refrain from wantonly or willfully causing injury and to warn of hidden dangers in some circumstances.[22] Thus, a licensor cannot be held liable for ordinary negligence.[23] Finally, a "trespasser is one who, without express or implied authorization, invitation or inducement, enters private premises purely for his own purposes or convenience" and not by invitation.[24]
Generally, a landowner must avoid injuring a trespasser with willful or wanton misconduct.[25]
 {¶ 33} In determining the duty the church owed to Eagle, we focus on Eagle's status as a participant in the tree-trimming task, because his injury resulted from his participation in this task and not from his status as a person present on the church's property in general.[26]
 {¶ 34} Eagle, who was not a church member though he attended church services and activities at times, was on the church property to offer assistance in digging a ditch. But his participation in the tree-trimming task was not due to the pastor's solicitation of volunteers or anyone else's solicitation of his help for this task. In fact, Eagle's father unequivocally told him not to participate in this task. Ultimately though, Eagle was allowed to participate in the tree-trimming task, and that arguably provided an economic benefit to the church.
 {¶ 35} We do not need to decide Eagle's status at the time of the accident, where Eagle failed to present sufficient evidence to support a finding of liability even if Eagle was an invitee who was owed the highest duty of care. It was undisputed that Eagle was warned of the danger; that the church had always used volunteers, *Page 11 
including Merida and Owens, to perform similar tree-trimming tasks in the past; and that these volunteers had performed in the past without incident. Eagle did not present any testimony from a tree-trimming professional to attack the church's decision to use these same volunteers to remove this limb. Under the facts of this case, we hold that reasonable minds could come to but one conclusion, and that conclusion was that the church did not breach a duty of care owed to Eagle.
 {¶ 36} Accordingly, we hold that the church did not breach the duty it owed to Eagle under a theory of premises liability. Therefore, the church was not liable for Eagle's injury as a matter of law on this basis.
 Conclusion {¶ 37} We conclude, after our de novo review, that none of the defendants were liable to Eagle for his injuries. Accordingly, we overrule the assignment of error and affirm the trial court's judgment.
Judgment affirmed.
PAINTER, P.J., and HENDON, J., concur.
[1] Doe v. Shaffer, 90 Ohio St.3d 388, 390, 2000-Ohio-0186,738 N.E.2d 1243.
[2] See Civ.R. 56(C).
[3] See Gallagher v. Cleveland Browns Football Co. (1996),74 Ohio St.3d 427, 431, 659 N.E.2d 1232.
[4] See Marchetti v. Kalish (1990), 53 Ohio St.3d 95, 99-100,559 N.E.2d 699.
[5] See Thompson v. McNeill (1990), 53 Ohio St.3d 102, 103-104,559 N.E.2d 705.
[6] See Gallagher, 74 Ohio St.3d at 432.
[7] See Whisman v. Gator Investment Properties, Inc.,149 Ohio App.3d 225, 236, 2002-Ohio-1850, 776 N.E.2d 1126.
[8] See Hardy v. Hall, 2nd Dist. No. 19751, 2003-Ohio-4978, at ¶ 18.
[9] See Id.
[10] See Gentry v. Craycraft, 101 Ohio St.3d 141, 2004-Ohio-379,802 N.E.2d 1116, at ¶ 11, citing 2 Restatement of the Law 2d, Torts (1965), Section 496C, Comment b.
[11] See Bildodeau v. Jordan, 1st Dist. No. C-020496, 2003-Ohio-1540, at ¶ 7.
[12] Englehardt v. Philipps (1939), 136 Ohio St. 73, 23 N.E.2d 829, paragraph two of the syllabus.
[13] See Lichtenthal and Feldman v. St. Mary's Church (1990),561 N.Y.S.2d 134, 136, 166 A.D.2d 873.
[14] See R.C. 2305.38.
[15] See Hanson v. Kynast (1986), 24 Ohio St.3d 171, 173,494 N.E.2d 1091.
[16] Id. at paragraph one of the syllabus.
[17] See Gladon v. Greater Cleveland Regional Transit Auth.,75 Ohio St.3d 312, 315, 1996-Ohio-137, 662 N.E.2d 287.
[18] See Light v. Ohio University (1986), 28 Ohio St.3d 66, 68,502 N.E.2d 611.
[19] Id.
[20] Id. (emphasis removed from original).
[21] Id.
[22] See Hannah v. Ehrlich (1921), 102 Ohio St. 176, 131 N.E. 504, paragraph four of the syllabus.
[23] See Light, 28 Ohio St.3d at 68.
[24] McKinney v. Hartz Restle Realtors, Inc. (1987),31 Ohio St.3d 244, 246, 510 N.E.2d 386.
[25] See Glason, 75 Ohio St.3d at 317.
[26] See id. at 315-316; Salmon v. Rising Phoenix Theatre, 12th Dist. No. CA2005-11-491, 2006-Ohio-4328, at ¶ 15. *Page 1